IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:15-CR-00446-DAP |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| TERRENCE JOSEPH MCNEIL, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S SENTENCING
MEMORANDUM AS TO DEFENDANT TERRENCE MCNEIL

I.      INTRODUCTION

Now comes the United States of America, by and through its attorneys, David A. Sierleja,

Acting United States Attorney, and Christos N. Georgalis and Michelle M. Baeppler, Assistant

United States Attorneys, and files this Sentencing Memorandum as to Defendant Terrence

Joseph McNeil.  Defendant has pleaded guilty pursuant to an 11(c)(1)(C) Plea Agreement, which

calls for a sentence within the range of 15 - 20 years imprisonment.  For the reasons detailed

below, this Court should impose the highest possible sentence in this range:  a 20-year sentence.

II.      FACTUAL BACKGROUND

A.      Case Summary

Terrence McNeil was a resident of Akron, Ohio.  Beginning at least as early as May,

2014, McNeil maintained several online social media accounts, including Facebook, Tumblr, and

Twitter.  Defendant declared his support for the Islamic State of Iraq and the Levant (hereinafter, "ISIS"), an organization designated by the United States Secretary of State as a foreign terrorist organization, and published, threatened, and solicited violent crimes against United States military personnel in support of that terrorist organization.

Since 2013, ISIS has claimed credit for numerous terrorist activities, including seizing Mosul, a city in northern Iraq, launching rocket attacks on eastern Lebanon in March 2014, the November 2015 terrorist attacks in Paris, France, and the March 2016 suicide attacks in Brussels, Belgium, the burning to death of a Jordanian pilot and beheadings which were posted on social media, among many others.  These terrorist attacks are part of ISIS's broader goal of forming an Islamic state or "caliphate" in Iraq and Syria.  Since at least September 2014, ISIS has called for attacks against United States citizens, including members of the United States military, and citizens of other countries participating in the United States-led coalition against ISIS.

Defendant used his social media accounts to post statements and images, among other things, that aimed to solicit violence, threaten, and publish identifying information of individuals that ISIS deemed targets.  He was fully aware that ISIS was a terrorist organization that engaged in lethal terrorist activity.  See Plea Agreement at ¶ 32.  He knew that ISIS targeted and killed citizens of countries militarily opposed to ISIS.  He was fully aware of ISIS's desire to target the United States.  As defendant admitted in his plea agreement, on April 21, 2015, he posted on a social media account, "No American citizen is safe, fisabillah they are all valid target [sic].  Until our brothers and sisters are free from imprisonment, harassment, torture, bombs, and bullets American will bleed inshallah."  Plea Agreement at ¶ 25g.  Defendant's followers, friends, and viewers included like-minded individuals who have expressed support for the Islamic State. Defendant corresponded with these fellow supporters by reblogging, retweeting, chatting and

liking communications between them.  The conduct relating to Defendant's charged offenses stem from five specific social media posts made by Defendant in September and October 2015. But the investigation also revealed many instances where Defendant researched the price online of firearms for sale at local firearm dealerships and possessed detailed bomb-making instructions.  Defendant's conduct both online and offline, however, demonstrate his intent to threaten, intimidate, and solicit the murder of United States servicemen and women.

Defendant's first social media post offense related to a public post made by Defendant on his Tumblr account on or about September 24, 2015, threatening approximately one-hundred United States military servicemen and women.  The post contained a file that displayed a banner titled "Islamic Hacking Division" with the black flag commonly used by ISIS.  The post stated "Target: United States Military" and "Leak: Addresses of 100 US Military Personnel."  The file was a .gif file, allowing multiple still images to loop displaying photographs, names, and home addresses of 100 military service personnel.

The post began with the statement:

"O Kuffar in America, O you who worship the cross, O You crusaders that fight the Islamic State, we say to you: 'DIE IN YOUR RAGE,' die in your rage because with the grace of Allah, The Islamic State Hacking Division (SHD) has hacked several military servers, databases and emails and with all this access we have successfully obtained personal information related to military personnel in the United States Air Force, NAVY, & Army….  [W]e have decided to leak 100 addresses so that our brothers residing in America can deal with you."

The post continued by saying "Kill them in their own lands, behead them in their own homes, stab them to death as they walk their streets thinking that they are safe…" It then circled through several slides of photographs of American military personnel, including their home addresses and military branch.  Many images contained pictures of the military personnel

3

holding young children.  The final image contained a picture of a handgun and a knife with the text "….  and kill them wherever you find them…"

Shortly after his first offense, Defendant on or about September 29, 2015, posted on his Twitter account the names and photographs of two United States military personnel, including their military divisions and home addresses.  This public post stated, "Wanted to kill New Name…." in Arabic and English and was made publicly available.  On that same day, Defendant also posted a similar tweet that included the photograph of a different United States military member alongside two young children, and included his name, purported address, and military division.  Like his other tweet, the public post stated "Wanted to kill New Name…" in Arabic and English.

On or about October 3, 2015, Defendant posted on both his Twitter and Tumblr account the purported home address of the United States Navy Seal who killed Osama Bin Laden.  The post read, "Released – Address of the US Navy Seal [R.O.] who killed Sheikh Osama Bin Laden R.A.  - #GoForth #RunRobertRun….I am posting the address to brothers & to Al Qaeda in the U.S. as a number one target."  The tweet and Tumblr post included a link to a website that stated "Breaking News" and claimed to provide the Navy Seal's home address.  It also included disparaging language about the serviceman, including calling him a "mummy's boy who has been trying to hide."  Defendant added his own statement, "don't let this kafir sleep peacefully," to his Tumblr post.

In addition to posting these threats and attempting to solicit violent acts against military service members, Defendant's social media accounts were filled with ISIS propaganda and disturbing posts.  Defendant posted statements such as "I can't wait for another 9/11, Boston bombing, or Sandy Hook!!!" and "I would gladly take part in an attack on this murderous regime

4

and the poeple [sic]."  He later posted "No American citizen is safe, fisabilillah they are all valid target [sic].  Until our brothers and sisters are free from imprisonment, harassment, torture, bombs, and bullets American will bleed inshallah."  His Tumblr account contained videos of ISIS executing individuals, including by blowing up a car with a grenade and drowning prisoners in a cage.  (R. 80, Government's Exhibit List, Ex. 169, PageID 665).  He posted a video taken by an adult male of a young child cutting off the head of a teddy bear with a large knife while yelling "Allahu Akbar."  (R. 80, Government's Exhibit List, Ex. 210, PageID 670).  Additionally, he posted a series of images of executions by beheading with a machete and commented:  "Those who have apostate and help the crusaders, this is your ending in the Islamic State." (R. 80, Government's Exhibit List, Ex. 238, Page ID 673).

Moreover, when confronted by law enforcement about his postings on social media, the Defendant equated United States military personnel with "terrorists."  This statement echoes sentiments that Defendant shared in two postings uploaded on May 25, 2015.  In the first of these postings, Defendant admitted in his Plea Agreement that he posted a series of photographs of dead U.S. military personnel and wrote, "Some dead terrorist for your memorial day."  In the second of these postings, Defendant admitted in his Plea Agreement that he posted a series of graves at Arlington Cemetery with people weeping by the gravesites, and wrote, "The friends and family of dead terrorists crying."  Plea Agreement at ¶¶ 25l, m.  These statements are just a fraction of the relevant statements Defendant made online and are strongly corroborative of his intent to solicit the murder of American service men and women and his intent to threaten and incite crimes against them.

B.       Victim Impact

Defendant's conduct has had a profoundly devastating and lasting impact on his victims. In anticipation of Defendant's sentencing, many of Defendants victims provided victim impact statements and filled out questionnaires describing the effect Defendant's conduct has had on their lives.  These documents were provided to Defendant and the Court through the U.S. Probation Office.  A small fraction of these statements have been highlighted and are provided below.

Victim #1:  "This crime has affected my family emotionally and financially.  It has affected not just my immediate family, but also my extended family.  Immediately following the release of my family's personal information, my family (including my wife, parents, and siblings) experienced a significant increase in stress, fearing for their lives.  No one should ever have to fear physical harm to themselves or families in their own home.  This act has particularly grievous undertones with me as my family was threatened because I chose a profession which involves significant sacrifices in service to my country.  This crime was the first time I ever questioned that I chose the right profession."

Victim #2:  "Most burdensome is the continuing network of terror continued by McNeil and others like him.  This crime strikes at the very heart of our American values of life, liberty, and the pursuit of happiness.  The threat against my life and those I love is daunting.  It has restricted the liberties in my life related to open communication and closeness with military colleagues and family, for fear of revealing my traveling locations and identities and location of my children and their families.  I remain hampered in my abilities to buy or sell property of move freely.  These are attacks on my fundamental rights as a citizen of this nation."

Victim #3:  "When the first threat issued by ISIS came out in 2015, it was significantly alarming.  During this time, I purchased several firearms, obtained my concealed carry license, increased security around my home and office, talked with the FBI/AFOSI/other law enforcement agencies, and spent probably hundreds of hours explaining the situation to people.  The most important was to explain to my family.  While my wife understood, the hardest part was explaining it to my children. . . .  I was informed of another person in the U.S. who remade/re-released the list, Terrence McNeil.  He was arrested after the threats were sent out.  At that point, all those emotions from the first incident came back (anger, frustration, annoyance, anxiety) and I had to re-emphasize security with my family and company.  It's one thing to be vaguely threatened by a terrorist overseas.  It's quite another to be threatened by name with your address."

Victim #4:  "As military service members, we are used to putting ourselves in harm's way, but having to worry about domestic radicalized people threatening our family at our home must be stopped and punished."

III.    LAW AND ARGUMENT

A.    Sentencing Law

The U.S.  Supreme Court has held that the U.S. Sentencing Guidelines are "effectively advisory."  <u>Booker</u>, 543 U.S. 220, 245 (2005).   The Supreme Court advised sentencing courts that, even "[w]ithout the 'mandatory' provision, the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals," specifically citing those goals listed in 18 U.S.C. § 3553(a).   <u>Id</u>. at 259; <u>see also</u> <u>United States v. Kimbrough</u>, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence.").   The

Supreme Court has instructed that the sentencing court should calculate the Guidelines range, permit the parties "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and pronounce a sentence taking into account all of the relevant factors.  Gall v. United States, 552 U.S. 38, 49-50.  In the event that the sentencing court decides to impose a sentence at variance with a Guidelines calculation, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance."  Id. at 50 (noting that a "major departure should be supported by a more significant justification than a minor one.").  Therefore, a district court must properly calculate and consider the advisory Guidelines range.  See, e.g., United States v. Haj-Hamed, 549 F.3d 1020 (6th Cir.  2008).

In Rita v. United States, 551 U.S. 338 (2007), the Supreme Court held that courts of appeals may apply a non-binding presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines.  Id. at 347.  The Supreme Court further held that rather than having independent legal effect, the courts of appeals' "reasonableness" presumption "simply recognizes the real-world circumstance that when the district judge's discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable."  Id. at 350-51.

To facilitate appellate review, the Sixth Circuit has encouraged the sentencing judge to "explicitly state [the] reasons for applying particular Guidelines, and sentencing within the recommended Guidelines range, or in the alternative, for choosing to sentence outside that range."  United States v. Jones, 399 F.3d 640, 650 (6th Cir. 2005); see also Gall v. United States, 522 U.S. 38 ; United States v. Haj-Hamed, 549 F.3d 1020 .

B.     Advisory Guidelines Calculation

The U.S. Probation Office (hereinafter, the "USPO") has set forth the following advisory

guidelines calculation in the Presentence Investigation Report (hereinafter, the "PSR").

**Group 1: Counts 1 and 2: September 24, 2015 Tumblr Threat and Solicitation in violation of 18 U.S.C. §§ 875(c) and 373(a).**

| | | |
|---|---|---|
| Base Offense Level: | 33 | § 2A1.5(a) |
| Victim Adjustment for Federal Employee: | +6 | § 3A1.2(a) |
| Terrorism Enhancement: | +12 | § 3A1.4(a) |
| Total Offense Level Group 1: | 51 | |

**Group 2: Counts 4 and 5: September 29, 2015 Twitter Threat and Solicitation in violation of 18 U.S.C. §§ 875(c) and 373(a).**

| | | |
|---|---|---|
| Base Offense Level: | 33 | § 2A1.5(a) |
| Victim Adjustment for Federal Employee: | +6 | § 3A1.2(a) |
| Terrorism Enhancement: | +12 | § 3A1.4(a) |
| Total Offense Level Group 2: | 51 | |

**Group 3: Counts 7 and 8: September 29, 2015 Tumblr Threat and Solicitation in violation of 18 U.S.C. §§ 875(c) and 373(a).**

| | | |
|---|---|---|
| Base Offense Level: | 33 | § 2A1.5(a) |
| Victim Adjustment for Federal Employee: | +6 | § 3A1.2(a) |
| Terrorism Enhancement: | +12 | § 3A1.4(a) |
| Total Offense Level Group 3: | 51 | |

**Group 4: Counts 10, 11, 13, and 14: October 3, 2015 Twitter and Tumblr Threat and Solicitation in violation of 18 U.S.C. §§ 875(c) and 373(a).**

| | | |
|---|---|---|
| Base Offense Level: | 33 | § 2A1.5(a) |
| Victim Adjustment for Federal Employee: | +6 | § 3A1.2(a) |

| | | |
|---|---|---|
| Terrorism Enhancement: | +12 | § 3A1.4(a) |
| Total Offense Level Group 4: | 51 | |

**Total:**

| | |
|---|---|
| Greater of Adjusted Offense Levels Above: | 51 |
| Increase in Offense Level: | +4 |
| Combined Offense Level: | 55 |
| Acceptance of Responsibility: | -3 |
| Subtotal: | 52 |
| Total Offense Levels (if excess of 43, level will be treated as 43): | 43 |

The government believes the USPO properly determined Defendant's total offense level. The enhancements are discussed below.

### 1.    Base Offense Levels & Specific Offense Characteristics

The base offense level of 33 for all four groups of crimes is appropriate because Defendant pleaded guilty to offenses referenced in the U.S.S.G. § 2A1.5 guideline (*e.g.,* counts of solicitation of murder).  Moreover, because Defendant agreed in the Plea Agreement and has offered no objection to the properly calculated base offense level of 33, there is no basis for not assessing said offense level.

### 2.    Victim Related Adjustment for Government Employee

The PSR properly assigned a +6 level enhancement for all four groups under U.S.S.G. § 3A1.2(a) because the victims were current or former government employees and the offense was motivated by the official status of the victims.  This enhancement provides for an increase of 3 levels, but because the base level offense is outlined in Chapter Two, Part A (Offenses Against the Person) in the Federal Sentencing Guidelines, the enhancement increases the sentencing level

10

by 6. The individuals Defendant solicited to have murdered were current and former military service men and women, thus satisfying this victim related adjustment. Moreover, because Defendant agreed in the Plea Agreement and has offered no objection to the properly calculated victim enhancement of +6, there is no basis for not assessing this enhancement.

        3.     Terrorism Enhancement

The PSR properly assigned a +12 level enhancement under U.S.S.G § 3A1.4 because Defendant's felonies intended to promote federal crimes of terrorism as defined by 18 U.S.C. § 2332b(g)(5). Additionally, the terrorism enhancement provides that Defendant's criminal history shall be Category VI. Defendant's threats and solicitations of violent crimes against military personnel intended to promote a violation of 18 U.S.C. § 1114, relating to killing or attempted killing of officers and employees of the United States.

        i.     Terrorism Enhancement Generally

U.S. Sentencing Guidelines (U.S.S.G.) § 3A1.4 provides a 12-level increase in the offense level, with a minimum offense level floor of 32, and an increase of the criminal history category (CHC) to level VI if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism. U.S.S.G. § 3A1.4 (2016). Section 3A1.4 requires proof of two elements: (1) the defendant must have been convicted of an offense that involved or was intended to promote a federal crime of terrorism; and (2) the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, app. 4.A (stating that the "federal crime of terrorism" is defined by cross-reference to 18 U.S.C. § 2332b(g)(5)). Section 3A1.4 can be applied at the sentencing phase after an individual has been convicted of an offense that involved or was intended to promote a federal crime of terrorism enumerated in § 2332b(g)(5)(B),

provided that the government proves by a preponderance of the evidence that the committed offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  U.S.S.G. § 2332b(g)(5)(A).

For the court to apply the terrorism enhancement, a prosecutor must also prove by a preponderance of the evidence that the individual's motivation behind committing the terrorism offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  Id.  It is not necessary, however, to prove a defendant's individual motivation.  As the Second Circuit noted, the terrorism enhancement:

> does not require a finding that [the defendant] was personally motivated by a desire to influence or affect the conduct of government.  Rather, the government need only demonstrate that [the defendant] intended to promote a crime calculated to have such an effect, i.e., that his offenses were intended to promote a federal crime of terrorism as defined in § 2332b(g)(5), whatever [the defendant]'s reason for committing them.

United States v. Awan, 607 F.3d 306, 315–16 (2d Cir. 2010); see also United States v. El-Mezain, 664 F.3d 467, 571 (5th Cir. 2011) as revised (Dec. 27, 2011); United States v. Jayyousi, 657 F.3d 1085, 1115 (11th Cir. 2011); but see United States v. Chandia, 514 F.3d 365, 376 (4th Cir. 2008).  Additionally, the government affected need not be the U.S. federal government.  It can be a foreign government, United States v. Stewart, 590 F.3d 93, 144–45 (2d Cir. 2009), or it can be a local or a state government, United States v. Thurston, No. CR 06-60069-01-AA et al., 2007 WL 1500176 at *12 (D. Or. May 21, 2007).  Further, the terrorism enhancement is not limited to acts of international or transnational terrorism, and it has been applied in domestic terrorism cases which implicate a federal crime of terrorism.  United States v. Stafford, 782 F.3d 786, 791–92 (6th Cir. 2015).

A defendant need not be convicted of one of the enumerated federal crimes of terrorism for § 3A1.4 to apply.  The crime could "involve" or be "intended to promote" a federal crime of

terrorism.  U.S.S.G. § 3A1.4(a); United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir. 2004) (applying the enhancement to 18 U.S.C. § 844(n) conspiracy to advance a substantive violation under 18 U.S.C. § 844(i), the latter being a federal crime of terrorism); United States v. Graham, 275 F.3d 490, 517 (6th Cir. 2001) (applying the enhancement to a § 371 count involving multiple federal crimes of terrorism).  Additionally, an offense that involves "harboring or concealing a terrorist who committed a federal crime of terrorism" or "obstructing an investigation of a federal crime of terrorism" are considered to have involved or to have been intended to promote a federal crime of terrorism. § 3A1.4 cmt. n.2; United States v. Ashqar, 582 F.3d 819, 825–27 (7th Cir. 2009) (applying the enhancement to charges under 18 U.S.C. §§ 401(3), 1503); United States v. Benkahla, 530 F.3d 300, 311–12 (4th Cir. 2008) (applying terrorism enhancement to charges under 18 U.S.C. §§ 1623, 1503, and 1001 even after defendant was acquitted of terrorism charges in an earlier trial); see also U.S.S.G. § 2J1.2(b) (if the terrorism enhancement is not applied to a conviction under 18 U.S.C. § 1001 or § 1505 with regard to a matter relating to international or domestic terrorism, the guideline calculation is increased by 12 levels).

ii.     Defendant's Intent to Promote a Federal Crime of Terrorism

As provided above, a defendant need not be convicted of a statutorily defined crime of terrorism for the terrorism enhancement to apply.  United States v. Graham, 275 F.3d 490, 517 (6th Cir. 2001).  This is consistent with other provisions of the Federal Sentencing Guidelines that allow for offense levels to be adjusted when a defendant did not necessarily commit the act, but was acting in furtherance of that crime.  Id. citing U.S.S.G. § 1B1.3.  Thus, for the terrorism enhancement to apply, this Court must properly identify the enumerated "federal crime of terrorism," that the defendant intended to promote, satisfy the elements of 18 U.S.C. § 2332b(g)(5)(A), and support its conclusions by a preponderance of the evidence with the facts

13

from the record.  Id.  A "federal crime of terrorism" is defined as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is in violation of an enumerated felony.  18 U.S.C. § 2332(b)(g)(5).

Defendant's social media posts clearly demonstrate his intent to promote a federal crime of terrorism.  Defendant's posts aimed to influence government conduct by targeting government employees.  Defendant's posts were designed and intended to threaten American military personnel and to solicit violent crimes against them.  Defendant's posts stated phrases like "kill them wherever you find them," and "don't let this kafir sleep peacefully."  The government obtained hundreds of Defendant's posts demonstrating his support for ISIS, some of which are reflected in the Plea Agreement and all of which further confirmed that Defendant intended for his posts to incite violence towards American military personnel.  See, e.g., Plea Agreement at ¶¶ 25k, 25q, 25u, 25v, 25x, 25z, 31.

Following the postings identifying more than 100 United States military personnel for attack, the government had to notify all of the service men and women that they were targets of this list.  As provided in the Victim Impact Statements, victims purchased firearms, left their homes, and installed security systems to ensure they and their families were safe.  Defendant repeatedly called these men and women "terrorists" and labeled them as "valid targets," further confirming his intent to harm government officials specifically.  Thus, Defendant's conduct undeniably satisfies the first element of inciting a "federal crime of terrorism." 18 U.S.C. § 2332b(g)(5)(A).  Defendant's postings concerning the United States Navy Seal who was identified as the person who killed Osama Bin Laden were arguably even more dangerous than the postings concerning the identification of the more than 100 United States military personnel.  Defendant posted this service victim's address, calling this victim "a number one target" and

encouraging followers, "Don't let this kafir sleep peacefully."  Such a direct challenge to undertake a violent attack against a specific military victim on account of his service to the United States underscores the gravity of the crimes committed by the Defendant and unmistakably qualifies as inciting a federal crime of terrorism.

Defendant's posts were also made in furtherance of 18 U.S.C. § 1114, a crime enumerated in 18 U.S.C. § 2332b(g)(5)(B).  This section relates to the killing or attempted killing of officers and employees of the United States.  18 U.S.C. § 1114.  Clearly the actions that Defendant aimed to promote were the murders of American service men and women.  He even posted "I'll be proud when I sled [sic] american blood."  These words, which are Defendant's own words, demonstrate that Defendant intended to incite violence towards American military personnel, making the terrorism enhancement appropriate.

Although Defendant was not convicted of this crime of terror, defendant's postings of incendiary messages in support of ISIS are precisely the type of conduct meriting application of the terrorism enhancement, as the commentary to § 3A1.4 states:

> "there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B); or (B) the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. §2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.  In such cases an upward departure would be warranted. . . ."

Defendant's activity on his social media accounts was calculated to promote violence on behalf of ISIS, to encourage followers to carry out attacks on specific United States military victims wherever they could be found (and providing specific location information to facilitate any

operation), in retaliation for United States military action against ISIS.  The terrorism enhancement is therefore appropriate in this case.

       iii.    Defendant's Memorandum in Support of His Objections to the Terrorism Enhancement.

As part of his sentencing related filings, Defendant filed a Sentencing Memorandum In Support of His Objections to Enhancement Pursuant to U.S.S.G. § 3A1.4 of the Guidelines.  (R. 95, the "Terrorism Guideline Memo," PageID 954).  In it, Defendant seems to be making a distinction between Defendant's conduct, which consisted of online social media posts, and other cases that involve actions taken in support of terrorist offenses, such as providing weapons, conspiring to fight yourself, etc.  This distinction is misplaced.  The guidelines use the term "promote," which does not itself require that such actions be taken.  Further, the Arnaout case from the 7th Circuit, cited by Defendant, in fact defines "promote" to include "encourage."  See United States v. Arnaout, 431 F.3d 994 (7th Cir. 2005).  That is precisely what Defendant did here:  solicitation, by its very nature, includes encouragement to commit the offense.

The Arnaout case is also distinguishable from Defendant's in a material way.  The objection with the enhancement in Arnaout was that there was not an identified federal crime of terrorism that the defendant was promoting.  The money was being provided to the Chechen Army, the Bosnian Army, and a Chechen provisional military group.  From the appellate decision, there was no indication that they were identified terrorist groups or that they were going to use the support to commit acts of terror.  Here, Defendant is promoting the murder of service members in violation of 18 U.S.C. § 1114, which is an identified terrorism offense in the 18 U.S.C. § 2332b(g)(5), and he is doing so to support ISIS, an identified terrorist organization. It is a completely different situation.

16

Defendant also relies on the purported lack of additional action in arguing that Defendant's motivation was not calculated to influence or affect the conduct of government. This misses the point.  Soliciting, and promoting, an offense means someone else is going to actually commit the offense, not Defendant himself.  Defendant is not subject to the terrorism enhancement because he committed or conspired to commit the murder of service members himself.  Rather, the enhancement should apply because he promoted their murder.  And the reason he promoted, in part, was to affect U.S. policy.  His statements to the agents on the day of his arrest confirm that.  He views the service men and women as terrorists.  He promotes their deaths on behalf of ISIS to change U.S. policy towards ISIS and towards Muslims in general, as reflected in the references to war on Islam in the .gif on Tumblr.

Defendant also completely ignores the retaliation prong of the definition.  Again, the .gif makes clear that this is retaliation against these service members for the bombing campaign against ISIS.  Most of the threats are specifically against Air Force personnel, who would be associated with a bombing campaign.  There are references to the bombing campaign and attacks of the crusaders.  The inference from this statement is that it is about retaliation.  And the solicitation of the murder of Navy Seal who killed Osama Bin Laden is clearly about retaliation. The reason he was targeted was because he killed Osama Bin Laden.

### 4. Defendant's Guidelines Range

As provided above, the USPO properly calculated Defendant's offense level as 43. Defendant has disputed this offense level calculation, believing that the Acceptance of Responsibility reduction of three levels should be applied after the Chapter 5, Part A reduction to level 43.  The United States Sentencing Guidelines state that adjustments or reductions in offense level determined under Chapter 3 shall occur prior to determining the defendant's offense level

17

in Chapter 5.  U.S.S.G.  § 1B1.1.  As such, USPO properly applied the Acceptance of

Responsibility reduction, and Defendant's offense level is 43.

With a criminal history category of VI based on the terrorism enhancement, his guideline

range is life, although the statutorily authorized maximum sentence is 1,500 months.  As a result

of the Rule 11(c)(1)(C) Plea Agreement, the range of imprisonment is 180 months to 240

months.  Therefore, the Guidelines support a sentence at the highest possible end of this range.

C.      The Section 3553(a) Factors Weigh In Favor of a 20 Year Sentence

An examination of the statutory factors under 18 U.S.C. § 3553(a) shows that a sentence

at the highest possible end of the range outlined in the parties' plea agreement, i.e., a 20 year

sentence, is appropriate.  Title 18, United States Code, Section 3553(a) states, in pertinent part:

(a) Factors to be Considered in Imposing a Sentence.   The court shall impose a
sentence sufficient, but not greater than necessary, to comply with the purposes set
forth in paragraph (2) of this subsection.  The court, in determining the particular
sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and
characteristics of the defendant;

(2) the need for the sentence imposed;

(A) to reflect the seriousness of the offense, to promote respect for
the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational
training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C.  § 3553(a).

The nature and circumstances of the offense clearly call for a sentence at the highest end of the agreed upon sentencing range.[1]  Defendant was actively engaging in social media posts aimed at undermining American national security.  His public posts could be viewed anywhere in the world, further threatening American military personnel and their families.  His posts were part of a larger movement to grow support for ISIS in the United States and abroad.  Defendant's support for this organization cannot be understated.  His conduct was egregious and motivated by his support for a terrorist organization.

A 20-year sentence is also warranted to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, protect the public, and provide just punishment for the offense.  Clearly, Defendant's crime was a very serious offense.  As American national security continues to be of the utmost importance with the rise of violence at home and abroad, offenses like Defendant's need to be punished seriously.  Defendant posted "I can't wait for another 9/11, Boston bombing, or Sandy Hook!!!"  Moreover, Defendant's own words in one of his posts suggest that a 15-year sentence, which he is requesting this Court impose, is clearly not enough to protect the public:  "Give brothers 7-15 years in prison for trying to make hijrah to the Islamic state is ridiculous. What do you thing [sic] these brothers are going to do when they get out."

---

[1]  In his Sentencing Memorandum, Defendant cites a litany of cases where a defendant received a fifteen-year sentence in a terrorism related case in support of his argument that his client should also receive a fifteen-year sentence.  (R. 94, Defendant's Sentencing Memorandum, PageID 948-951).  Defendant's list is clearly not an authoritative listing of terrorism case sentences.  It also ignores that for most, if not all of the cases Defendant cites, the maximum punishment for a violation of 18 U.S.C. § 2339B, which most if not all of those defendants were convicted of, was only fifteen years.  So, most if not all of Defendant's cases are examples of defendants receiving the maximum possible sentence for the crimes charged.  Similarly, this Court should apply the maximum possible sentence under the terms of the 11(c)(1)(C) agreement, 20 years, which is also the maximum sentence for a violation of 18 U.S.C. § 373 under these circumstances.

The motivation behind his posts were clearly to incite violence.  His posts spanned over a year, including graphic videos of people being beheaded, excitement towards the deaths of non-Muslims, and pride in violence committed against Americans.  There is a reason that Defendant's statutory guidelines were life in prison.  His own statements on what ISIS supporters will do after a shorter sentence are indicative of the need for a substantial sentence.  This was a serious crime that deserves a serious punishment.  Defendant's actions resulted in serious harm towards the victims as provide in the examples above and the whole universe of statements in the Court's possession.  To deter others from posting threatening content like Defendant, a significant sentence is needed.

Furthermore, this Court has received and reviewed many victim impact statements describing in detail the devastatingly profound and lasting impact Defendant's conduct has had on them and their families.  Each time Defendant's posts are reposted and promulgated, the victims are threatened again by a new group of terrorists who may have missed the original posting.  Because of this, it is a never-ending threat for these service members and their families.  And it doesn't end there.  Innocent people who happen to now live at the addresses named in the threats are now also at risk, even if they never served in the military.

For these reasons, the § 3553(a) factors call for a very significant sentence for Defendant at the highest end of the agreed upon sentencing range: 20 years imprisonment.

> D.    Restitution

A number of victims in this case have submitted requests for restitution.  The total amount of loss documented by victims was $114,378.17.  As discussed more fully below, Title 18, United States Code, Section 2259 provides that restitution is mandatory in a case such as this one.  Based on the calculations discussed in more detail below, the Court should order Defendant

to make restitution to each victim as a part of Defendant's sentence in the total amount of $114.378.17.

### 1.    Factual Background

As a result of Defendant posting the names and home addresses of over 100 United States service men and woman, many victims have had to take additional security measures to ensure the safety of their families.  Many victims purchased firearms, security cameras, and various home improvements, traveled away from their homes, or even moved as a result of the hit-list being distributed.  Several victims have noticed that the values of their homes have declined as a result of them being known targets for ISIS members.

### 2.    Legal Authority

"The primary goal of restitution is remedial or compensatory."  United States v. Paroline, 134 S. Ct. 1710, 1726 (2014).  Restitution also serves another important function – "impress[ing] upon offenders that their conduct produces concrete and devastating harms for real, identifiable victims."  Id. at 1727.  While Defendant's case is not a violation of child pornography as was the case in Paroline, similarities can be drawn in the allocation of restitution to victims whose identities have been stolen on hit-lists like the one Defendant distributed.

Subparagraph (b)(1) of Section 2259 provides that "[t]he order of restitution under this section shall direct the defendant to pay the victim .  .  .  the full amount of the victim's losses as determined by the court pursuant to paragraph (2)."  18 U.S.C. § 2259(b)(1).  The "full amount of the victim's losses" includes any costs incurred by the victim for, among other things, necessary transportation or temporary housing, lost income, attorney's fees, and "any other losses suffered by the victim as a proximate result of the offense."  18 U.S.C. § 2259(b)(3).

"An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A."  18 U.S.C. § 2259(b)(2).  Section 3664 provides that issues related to restitution "shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  18 U.S.C. § 3664(e).  Section 2259(b)(4)(B) provides that "the economic circumstances of the defendant" is not a valid reason to decline to issue an order of restitution. 18 U.S.C. § 2259(b)(4)(B)(i).  Nor may a court decline to issue a restitution order due to "the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source."  18 U.S.C. § 2259(b)(4)(B)(ii).

           3.      Case Law

As stated above, the issue of restitution for defendants like McNeil who distribute, but not produce, hit-lists is similar to the distribution of child pornography.  In both scenarios, Courts have not held defendants culpable for the initial harm in creating the item, but are culpable in the distribution.  The Supreme Court addressed the issue of proving causation in distribution and possession cases in its landmark decision in United States v. Paroline, 134 S. Ct. 1710 (2014).  In its decision, the Supreme Court determined that restitution may only be ordered to the extent the defendant's offense proximately caused the victim's losses.  In cases such as this one where the defendant's actions are not clearly traceable to the victim's harm, nor are already agreed upon in a plea negotiation, the Supreme Court has adopted an alternative causal standard.  Id. at 1727.

The alternative causal standard has been called an "aggregate causation theory."  Id. at 1723.  Using this standard, (i) a victim who has outstanding losses caused by the continuing traffic in the victim's images, but (ii) where it is impossible to trace a particular amount of those

losses to the individual defendant, then (iii) the Supreme Court advised district courts to "order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."  Paroline, 134 S. Ct. at 1723.  In this scenario, the victims' losses have been caused by the threats and solicitations to kill the victims and the trafficking of their pictures, names, and home addresses.  This approach undoubtedly involves discretion and estimation by judges, but works to provide justice to victims.  Id. at 1729.

The Supreme Court acknowledged that this causal calculation leaves open the question of how to determine the loss amount.  Id. at 1727.  While acknowledging that "it is neither necessary nor appropriate to prescribe a precise algorithm for determining the proper restitution amount," the Supreme Court did provide some guidance in how a district court should determine restitution.  Id. at 1728.  As such, the Supreme Court suggested that district courts determine "the amount of victim's losses caused by the continuing traffic in the victim's images." Id. Then, the court should "set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses."  Id.  The Supreme Court listed several factors to serve as guidelines in determining this amount.  They include:

- the number of past criminal defendants found to have contributed to the victim's general losses;

- reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;

- any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted);

- whether the defendant reproduced or distributed images of the victim;

- whether the defendant had any connection to the initial production of the images;

- how many images of the victim the defendant possessed;

- any other facts relevant to the defendant's relative causal role.

Id.  The Court further noted that the government "could also inform district courts of restitution sought and ordered in other cases." Id. at 1729.  See United States v. Hargrove, 714 F.3d 371, 375 (6th Cir. 2013) (holding that a defendant cannot be held responsible for harm that occurred before the date of his offense, but finding that harms that were proximately caused by the defendant and "clearly traceable" may still be assessed to Defendant).

4.    Alternative Causal Analysis for Defendant

The victims in this case are eligible for restitution pursuant to 18 U.SC. § 2259. Defendant pleaded guilty to distributing the names, addresses, and identifying information of military service men and women in an effort to incite violence against them and solicit their murders.  Several of these victims have submitted documentation showing that their outstanding losses caused by the continuing traffic in their images and identifying information is $114,378.17.  This cost stems from security precautions taken after their information was leaked. These costs include the purchasing of firearms, security systems, home repairs to make the home safer, and travel away from the home for safety.  These costs are recognized as compensable losses under the statute.  18 U.S.C. § 2259(b)(3).

None of the victims who have requested restitution have received any restitution payments so far.  Victims' restitution requests are supported by Victim Impact Statements, many of which included receipts for purchases.  Although the victims have carefully documented their losses, it is difficult to trace these losses specifically to Defendant.  Paroline, 134 S. Ct. at 1727. Thus, in applying the analysis set forth by the Supreme Court in Paroline, this Court should order Defendant to pay restitution to the victims "in an amount that comports with [his] relative role in the causal process that underlies the victim's general losses." Id.

24

a.      Causation

The Paroline standards for causation have been met.  By distributing the names, photographs, and identifying information, the defendant was "part of the overall phenomenon that caused her general losses." Paroline 134 S. Ct. at 1726.  Reproducing or distributing information in this case is akin to reproduction of child abuse images, as both play a part in causing harm to the victim in addition to the creation of the content itself.  Id. at 1725.  Although Defendant was not the sole cause of the victims' harms, Defendant was a cause-in-fact of them. Moreover, victims' are seeking restitution for costs that were a direct and foreseeable result of Defendant's distribution of their identifying information in the ISIS hit-lists.

b.      Apportionment

The government recommends that the Court follow a multi-factor apportionment approach that begins with a 1/n formula that was approved in Paroline.  Id. at 1727.  These will assist the court in fashioning a restitution order that is neither "severe" nor "token or nominal." Id.  It will also allow the court to render a restitution order that best reflects Defendant's conduct in light of the other causes to victims' losses.  Id

Based on the victims' statements and written submissions, the amount of loss is $114,378.17.  Based on information submitted by victims in letters and attachments, the adjusted figures is as follows:

| Guns, Ammunition, and Licensing Fees | $3,777.71 |
| Security Systems | $2,136 |
| Home Improvements | $6,864 |
| New Home Purchase or Rental Costs | $100,600 |
| Travel for Safety | $450 |
| Other Costs | $550 |

Following the alternative causal analysis set forth in <u>Paroline</u>, the total costs of $114,378.17 should be divided by the total number of defendants convicted or charged with distributing these images, or previously ordered to pay restitution.  Presently, there are four other defendants being charged with disseminating or posting this particular hit list, and one defendant who has been prosecuted and sentenced.  The figure that results from dividing $114,378.17 by 6 (5 other defendants + McNeil) is approximately $19.063.03.  Yet, because the other defendant who has been convicted was not required to pay restitution and it is unclear whether the future defendants will be convicted and ordered to pay restitution, this Court should order Defendant to pay the full amount of $114,378.17 to the victims of his crimes.

The Court may consider other factors in altering this amount, including future offenders with these hit lists.  Yet, as is the case with child pornography, distribution creates significant harm to the victims, and the act itself all but guarantees that others will view the information.  <u>Paroline</u>, 134 S. Ct. at 1728.  On balance, the potential for future individuals to contribute to victims' restitution should not result in a decrease from the $114,378.17 figure calculated.  This amount is neither severe nor nominal.

These victims indisputably suffered, and continue to do so, from the threat of an ISIS supporter inciting violence against them and their families and soliciting their murders.  The victims have supplied the USPO with detailed information documenting the nature and costs of the harm caused by Defendant, and these costs are recognized under the restitution statute.  Therefore, this Court should award the victims an appropriate amount of restitution based on Defendant's relative role in the causal process that underlies their losses.

IV.    CONCLUSION

For the foregoing reasons, the government requests that this Court impose a sentence of

20-years of imprisonment, which is at the highest end of the agreed upon range, as outlined in

this memorandum.  Moreover, this Court should impose a restitution order totaling $114,378.17

to the victims for the loss caused by Defendant's conduct.

Respectfully submitted,

DAVID A.  SIERLEJA
Acting United States Attorney

By:    /s/ Chris N.  Georgalis
Chris N.  Georgalis (OH: 0079433)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3971
(216) 522-2403 (facsimile)
Chris.Georgalis@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of June 2017 a copy of the foregoing document was filed electronically.   Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.   All other parties will be served by regular U.S.  Mail.   Parties may access this filing through the Court's system.

/s/ Chris N.  Georgalis
Chris N.  Georgalis
Assistant U.S.  Attorney